UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TONYA DEANE,                              *
                                         *
        Plaintiff,                       *
                                         *
        v.                               *          Civil Action No. 15-13373-ADB
                                         *
CAROLYN W. COLVIN,                       *
Acting Commissioner of the Social        *
Security Administration,                 *
                                         *
        Defendant.                       *

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

     Plaintiff Tonya Marie Deane ("Deane" or "claimant") brings this action pursuant to the

Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) & 1383(c)(3), challenging the final decision

of the Commissioner of the Social Security Administration (the "Commissioner") denying her

claim for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security

Income ("SSI") benefits. Before the Court are Deane's motion to reverse the Commissioner's

decision [ECF No. 15] and the Commissioner's motion to affirm the decision [ECF No. 16]. In

her motion, Deane challenges the decision of the Administrative Law Judge ("ALJ") on two

grounds: she claims that the ALJ (1) erred in his determination that claimant did not meet

Listings 3.02A or 3.03A; and (2) erred in his evaluation of claimant's Residual Functional

Capacity ("RFC") by "cherry-picking" the mental health evidence and failing to fairly reflect

claimant's moderate limitations in social functioning.

     As discussed below, the Court finds that the ALJ's decision is supported by substantial

evidence and therefore DENIES the claimant's motion to reverse and GRANTS the

Commissioner's motion to affirm.

1

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework; Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); <u>see also</u> 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). To qualify as a disability, the inability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511; <u>see also</u> <u>Ross v. Astrue</u>, Civ. A. No. 09-11392-DJC, 2011 WL 2110217, at *2 (D. Mass. May 26, 2011).

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the

application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### B.      Procedural Background

On May 2, 2012, claimant filed an application for SSDI and SSI benefits, claiming

disability from a combination of physical and mental impairments. [Tr. 9].[1] Claimant's alleged

disability onset date is April 30, 2009. Id. Claimant's SSDI and SSI benefits claims were initially

denied on September 13, 2012, and again upon reconsideration on June 7, 2013. Id. Claimant

subsequently requested and was granted a hearing, which took place before ALJ Goodale on

April 9, 2014. Id. Claimant testified at the hearing and was represented by counsel. Id. James F.

Scorzelli, Ph.D., also testified at the hearing as a vocational expert. Id. On May 27, 2014, the

ALJ issued a written decision finding that Deane was not disabled and therefore not eligible for

SSDI or SSI benefits. [Tr. 9–21]. On July 20, 2015, the Appeals Council of the Social Security

Administration denied Deane's request for review of the ALJ decision. [Tr. 1]. As a result, the

ALJ's May 27, 2014 decision is the final decision of the Commissioner of Social Security

subject to judicial review in federal district court pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3).

### C.      Factual Background

Deane was born on April 26, 1979, and alleges that her disability started on April 30,

2009, when she was thirty. [Tr. 19]. On May 2, 2012, Claimant applied for SSDI and SSI

benefits, [Tr. 9, 104], alleging disability due to bipolar disorder, PTSD, fibromyalgia, chronic

depression, ADHD, COPD, spinal arthritis, and degenerative disc disease, [Tr. 104]. Claimant

---

[1] References to pages in the transcript of the record proceedings are cited as "[Tr. __]." The ALJ's decision can be found beginning at [Tr. 9]. The administrative hearing transcript can be found beginning at [Tr. 28].

completed high school and one year of college. [Tr. 19, 367]. She worked as an associate at various retail locations from 2002 to 2008, as a certified nursing assistant at a nursing home/assisted living facility from January 2000 to April 2009, and as a waitress at a fast food restaurant from 1993 to 2005. [Tr. 367]. She lives with her son and fiancé. [Tr. 41]. The claimant met the insured status requirements of the Social Security Act through June 30, 2013 (her last date insured). [Tr. 11, 38].

Deane's extensive medical history is summarized below in pertinent part. Further information concerning Deane's medical history is provided, as needed, in the relevant sections. Richard Weiner, M.D., treated the claimant from April 2009 through 2012. [Tr. 465–550; 647–749]. In a March 29, 2010 residual functional capacity (RFC) assessment, Dr. Weiner noted that the claimant is not a candidate for gainful employment. [Tr. 458, 461]. Dr. Weiner also commented that the claimant can only walk for 15 minutes at a time, experiences great back pain, can sit for only 30 minutes, and can carry a maximum of 10 pounds. [Tr. 462–63].

The claimant received psychological treatment from NorthEast Health Services from April 2009 to November 2010. [Tr. 612–42]. Treatment notes mention mood swings and varying levels of depression and anxiety. Id. On April 7, 2009, T.J. Latimer, LMHC, at Northeast Health Services noted that the claimant was anxious and assigned her a Global Assessment of Functioning ("GAF") score of 60. [Tr. 639–41].[2] On November 1, 2010, Donna Lentini, LMHC,

---

[2] The Global Assessment of Functioning is used to assign a numerical value to an individual's overall level of functioning. A GAF score considers impairments in psychological, social, and occupational functioning, but not impairments related to physical or environmental limitations. The GAF Scale ranges from 1 to 100. A score between 41 and 50 denotes "serious symptoms" or "any serious impairment in social, occupational, or school functioning." A score between 51 and 60 denotes "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." A score between 61 and 70 denotes "some mild symptoms" or "some difficulty in social, occupational, or school functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders - Text Revision (DSM-IV-TR) 34 (4th ed. 2000).

at Northeast Health Services again assigned claimant a GAF score of 60. [Tr. 612].  The

claimant's highest GAF score in the twelve months preceding the November 1, 2010 score

assignment was 65. Id.

On January 4, 2011, the claimant saw licensed psychologist Edwards Powers, Ph.D., for a

psychodiagnostic interview and intellectual evaluation. [Tr. 998]. Most of the treatment notes

consist of the claimant's self-reported conditions, but Dr. Powers did make some observations.

He noted that Deane's behavior and attitude were attentive and responsive, her affect was alert

and consistent with her calm mood, and that she was in no acute emotional distress. [Tr. 999].

Dr. Powers observed that Deane's thought process and content appeared normal. [Tr. 1000]. A

cognitive test revealed that the claimant has an "average" intellectual endowment and a full IQ

score of 97. Id. Dr. Powers assigned Deane a GAF score of 50. [Tr. 1001]. On September 12,

2012, Deane saw Dr. Powers for another psychodiagnostic interview, during which he made the

same objective observations and again assigned a GAF score of 50 [Tr. 794–97].

The claimant has reported to the emergency room for various issues, including

pneumonia on January 22, 2010 [Tr. 803]; bronchitis on January 25, 2010 [Tr. 801–802];

wheezing, decreased air movements, and an upper respiratory infection on January 29, 2011 [Tr.

817–18]; shortness of breath, chronic obstructive pulmonary disorder/reactive airway disease,

and pleuris on September 23, 2011 [Tr. 814]; and opiate dependence on September 24, 2012 [Tr.

844].

The claimant received medical treatment from Tristan Medical between November 2012

and February 2014. [Tr. 886–901, 935–52]. Erika Cheesbro, PA-C, Brian Bonenfant, PA-C, and

Chelsea Rector, PA-C, also all treated the claimant and generally noted that Deane's mood,

affect, and memory were normal and that, in terms of respiratory function, her air movement was good and she had no wheezing, rales, rhonchi, or dyspnea. [Tr. 888, 892, 900, 938, 948].

From January 2013 to February 2014, the claimant received treatment from George Haywood, MSW (Master of Social Work), Dr. Finkelstein, and Geoffrey Whitley, NP-C (Nurse Practitioner, Certified), at DCS Mental Health. [Tr. 1007–16, 1025–59]. On January 12, 2013, Haywood assigned the claimant a GAF score of 60 and diagnosed her with major depression and PTSD. [Tr. 1015]. The record contains additional treatment notes from the DCS clinic, but it is unclear who signed several of them. [Tr. 16].

### D.   Administrative Hearing

### 1.   Deane's Testimony

At the May 27, 2014 hearing, the claimant testified that she has asthma, chronic obstructive pulmonary disease ("COPD"), spinal problems, degenerative disc disease, arthritis, and fibromyalgia. [Tr. 35]. She said that she handles her own finances [Tr. 45], can drive herself short distances [Tr. 46–47], and has no income but receives food stamps and cash benefits. [Tr. 47–48]. She further testified that she has health insurance and that she occasionally receives financial support from family members. [Tr. 49]. Deane stated that she has always been the primary caretaker of her son and that she splits the household chores with her fiancé. [Tr. 74–75].

Deane testified that she stopped working in 2009 because of back pain and anxiety. [Tr. 52]. Deane stated that her anxiety, depression, PTSD, and ADHD render her unable to work full-time. [Tr. 59–60]. She told the ALJ that she was sexually assaulted by a family member at the age of six and believes that her apprehension of other people and social situations stems from this experience. [Tr. 69, 85]. Two to five times a month, she has panic attacks involving

flashbacks of being assaulted that make it difficult for her to breathe. [Tr. 68–69]. She stated that her anxiety and PTSD revolve "around strange places or men," and that she finds it particularly challenging to be around men. [Tr. 73]. Deane testified that she currently has no friends and that she does not go out socially. [Tr. 78–79]. Deane further stated that she experiences great difficulty in dealing with strangers. [Tr. 84]. She tries to minimize contact with other people because she feels uneasy in social situations, even with people she is unrelated to but acquainted with. Id. The claimant further testified that her depression is constant and that she feels anxiety approximately 90 percent of the time. [Tr. 87].

### 2.      Vocational Expert's Testimony

At the hearing, the vocational expert testified that a person with Deane's limitations, as defined by the ALJ, cannot perform any of the claimant's past jobs (retail associate, certified nursing assistant, and waitress) because they all involve dealing with the public. [Tr. 96]. The vocational expert opined that a person with Deane's limitations could, however, perform other jobs that exist in the national or regional economy, such as being a mail clerk, hand cutter, or electronic assembler. [Tr. 96–97]. When the ALJ added the additional limitation of requiring two 20-minute breaks in addition to regular breaks and being "off task 15 to 20 percent of the workday," the vocational expert testified that a person with such limitations could not perform any of the claimant's past jobs and "would be unemployable" both in the regional and national economies. [Tr. 97–98].

### E.      The ALJ's Decision

In his May 27, 2014 decision, the ALJ determined that Deane was not disabled and therefore did not qualify for SSDI or SSI benefits. [Tr. 21]. The ALJ found as follows at each of the five steps in the sequential evaluation:

First, the ALJ found that Deane "has not engaged in substantial gainful activity since April 30, 2009, the alleged onset date." [Tr. 11].

Second, the ALJ found that Deane "has the following severe impairments: Spine disorder; bipolar disorder; COPD; asthma; depression; anxiety; PTSD; panic attacks." [Tr. 12].

Third, the ALJ found that Deane does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. [Tr. 12].[3] Specifically, the ALJ found that the claimant does not meet subsection A, B, or C of listing 3.02 concerning pulmonary insufficiency, or 3.03 concerning asthma. Id.

To meet listing 3.02A for COPD, a claimant must demonstrate an FEV1[4] value equal to or less than the values in outlined in Table I. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02. Given her height of 63 inches, Deane had to have an FEV1 score of 1.15 or below to satisfy the criteria for listing 3.02A. [Tr. 12]. The claimant's pre-bronchodilator FEV1 score was 1.72 and her post-bronchodilator score was 1.11. [Tr. 756]. As more fully discussed infra, the ALJ stated that Deane's higher FEV1 score of 1.72 was "more representative of the claimant's pulmonary functioning" and therefore found that the claimant does not meet listing 3.02A. [Tr. 12].

---

[3] The Social Security Administration has since revised its medical criteria for evaluating respiratory disorders. The revised standards became effective on October 7, 2016. The revised standards are inapplicable here, however, because the Social Security Administration's final rule stated that the Administration "expect[s] that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions." Revised Medical Criteria for Evaluating Respiratory System Disorders, 81 FR 37138-01 (June 9, 2016). When the ALJ found that Deane was not disabled on May 27, 2014, the former criteria remained in effect.

[4] The FEV1 value stands for "forced expiratory volume – one second." It is used to measure the amount of air than an individual can exhale in a single second following a deep breath in.

To meet listing 3.02B for chronic restrictive ventilator disease, a claimant must have an FVC[5] equal to or less than the values outlined in Table II, which also correspond to the claimant's height without shoes. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02. Given her height, Deane's FVC score had to be below or equal to 1.35. [Tr. 12]. Deane's January 25, 2012 spirometry report indicates that she had a pre-bronchodilator score of 3.37 and a post-bronchodilator score of 3.70, both of which far exceed the listing criteria. [Tr. 12, 756].

To meet listing 3.02C for chronic impairment of gas exchange, the claimant must demonstrate a single breath DLCO[6] of less than 10.5 ml/min/mm Hg or less than 40 percent of the predicted normal value. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02. Alternatively, the claimant has to show arterial blood gas values of PO2 and PCo2 equal to or less than the values specified in Tables III-A, III-B, or III-C. The claimant does not reference a single breath DLCO or P02 testing that satisfies the criteria of listing 3.02C.

To meet listing 3.03A, a claimant has to suffer from a breathing impairment that meets the criteria for COPD as defined in listing 3.02A. [Tr. 12]; 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.03. The ALJ stated that because the claimant did not qualify for listing 3.02A, she could not meet listing 3.03A. Id.

To satisfy listing 3.03B, the claimant must have asthma attacks "in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.03B. The ALJ stated that the record contains no evidence of any recent asthma-related hospitalizations. [Tr. 12].

---

[5] The FVC value stands for "forced vital capacity." It is used to measure the total amount of air that an individual exhales during an FEV ("forced expiratory volume") test.
[6] The DLCO value stands for the diffusion capacity of the lungs for carbon monoxide. It measures the efficiency of the lungs by determining how much oxygen travels from the lungs' alveoli to the blood stream.

Further, the ALJ found that Deane's mental limitations do not qualify for listing 12.04 (affective disorders) or 12.06 (anxiety-related disorders). [Tr. 12]; 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. The ALJ determined that Deane has "mild" restriction in activities of daily living; "moderate" difficulties in social functioning; "mild" difficulties with concentration, persistence and pace, and no episodes of decompensation lasting for an extended duration. [Tr. 13]. Accordingly, the ALJ determined that the claimant does not satisfy "paragraph B" or "paragraph C" criteria.[7] [Tr. 13–14]. Because the ALJ concluded that Deane did not have a listed impairment (or impairments of equivalent severity), the sequential analysis continued to steps four and five.

At step four, the ALJ found that Deane had the following RFC:

> [The claimant could] perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that the claimant could only occasionally stoop, crouch, crawl and kneel; could frequently climb ramps or stairs but could not climb ladders, ropes or scaffolds; and she could frequently reach overhead bilaterally. The claimant would need to avoid exposure to extreme cold, extreme heat, wetness, humidity and fumes, odors, dusts, gases, poorly ventilated areas and other pulmonary irritants, as well as to workplace hazards such as dangerous machinery and unprotected heights. The claimant could perform level 1- to 3-step tasks in a low-stress job having only occasional decision-making and occasional changes in the work setting. The claimant could have only occasional contact with the public and could have contact with co-workers but could not perform tandem tasks with co-workers.

---

[7] "To satisfy the 'paragraph B' criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks . . . . '[P]aragraph C' criteria . . . [include] repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate; or inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." [Tr. 12–14]; see also 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.

[Tr. 14]. In connection with Deane's RFC determination, the ALJ provided a detailed summary of Deane's medical history. [Tr. 15–19]. Based on the claimant's RFC, the ALJ concluded that Deane is unable to perform any past relevant work. [Tr. 19].

The ALJ did not entirely credit Deane's testimony regarding the intensity, persistence, and limiting effects of her symptoms. [Tr. 16]. In support of his adverse credibility determination, the ALJ cited several inconsistencies in the claimant's testimony [Tr. 16–17]. For example, the claimant told the ALJ that her fiancé provides significant childcare support, but the medical record indicates that the claimant is the primary caregiver for her son, which demonstrates the claimant's ability to complete daily activities. Id. Moreover, the ALJ was surprised by how little objective evidence the record contained about the claimant's alleged back pain, respiratory functioning limitations, and mental functioning limitations. [Tr. 17]. The claimant's doctors made no note of her allegedly significant mental functioning limitations and the claimant received less treatment than the ALJ expected for physical conditions as severe as alleged. Id. Finally, the claimant twice told the state agency consultative examiner that she has no history of substance abuse, but told the ALJ that she was taking methadone for her drug addiction. Id.

In determining Deane's RFC, the ALJ gave "little weight" to the findings of the Massachusetts Disability Evaluation Services ("DES"). Id. The ALJ noted that the DES "opinions are not signed by a medical doctor or any other official," and that it was unclear whether the opinions were based on Deane's self-reported limitations or on the medical evidence. Id. The ALJ discussed a reference to Dr. Weiner at South Coast Medical Associates in the DES records, but determined that Dr. Weiner did not review or sign any of the documents.

[Tr. 17, 909]. Finally, the ALJ noted that "a finding of disability from a different administrative agency is not binding on the Social Security Administration." [Tr. 17].

The ALJ gave "little to no weight" to Dr. Weiner's opinion that the claimant is not a candidate for full-time employment because the record revealed that Dr. Weiner had not treated Deane since March 2010 and because more recent medical evidence suggested that Deane was less impaired than Dr. Weiner had previously assessed.  [Tr. 17–18].

The ALJ gave Dr. Powers' examination reports "significant weight." [Tr. 18]. The ALJ explained that "neither of Dr. Powers' examination reports provide a clear medical source statement about the claimant's functioning limitations," but his overall findings are consistent with the ALJ's RFC determination. Id. In contrast, the ALJ gave "no weight" to Dr. Powers' determination that the claimant's GAF score was 50. Id. The ALJ found that the "evidence from Dr. Powers' own examination notes, as well as the claimant's treating sources, indicate the claimant is less limited than found by Dr. Powers' assigned GAF scores." Id.

The ALJ gave "substantial weight" to the medical source statement co-signed by Dr. Finkelstein and Mr. Haywood, which states that the claimant had a GAF score of 65 and that she was shy when interacting with others. Id. The ALJ assigned "no weight" to the later opinion statement signed only by Mr. Haywood, in which Mr. Haywood opined that the claimant had a GAF score of 48 and that the claimant had serious limitations. [Tr. 17–18]. The ALJ gave several reasons for his adverse credibility decision, including the fact that Mr. Haywood is not an acceptable medical source and that Mr. Haywood's opinion was inconsistent with the opinion he co-signed with Dr. Finkelstein just one year prior. [Tr. 16, 18–19]. Furthermore, Mr. Haywood neglected to explain or support his opinion that Deane's mental functioning had significantly

worsened. Id. Finally, the ALJ noted that Mr. Haywood's opinion incorrectly stated that the claimant's highest GAF score in the previous year was 50, and not 65. Id.

The ALJ gave "little weight" to the medical source statement cosigned by the provider's supervisor E. Kisch, M.D. [Tr. 19, 1065]. The ALJ found it unclear what information or treatment notes Dr. Kisch's opinion was based on because his name does not appear elsewhere in the record. [Tr. 19]. The ALJ also found it unclear whether the checkbox form was filled out based on the claimant's self-reported limitations, or based on the doctor's observations of Deane. Id.

The ALJ gave "substantial weight" to the state agency medical consultants' physical functioning finding and "little weight" to the state agency's finding regarding the claimant's mental functioning. [Tr. 19]. The ALJ explained that "the State agency's opinion on the claimant's physical condition is consistent with overall medical evidence of record and the claimant's admitted abilities." Id. The ALJ believed, however, that "the claimant's mental limitations impose significant work related functional limitations" and consequently chose to disregard the state agency findings concerning the claimant's mental functioning. Id.

At the fifth step, the ALJ found that with Deane's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." [Tr. 20]. The ALJ relied on the vocational expert's testimony to conclude that Deane could be a mail clerk, hand cutter, or electronics assembler. Id. Because the ALJ determined that the claimant can perform these jobs, he concluded that Deane is not disabled. [Tr. 20–21].

## II.   STANDARD OF REVIEW

Section 205(g) of the Act, under which Deane seeks judicial review of the denial of her

application for benefits, provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, <u>if supported by substantial evidence</u>, shall be conclusive . . . .

42 U.S.C. § 405(g) (emphasis added). Thus, the Commissioner's findings are conclusive so long

as they are supported by substantial evidence. <u>See</u> <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st. Cir.

1999).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>,

402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The

First Circuit has explained that:

> the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts. We must uphold the [Commissioner's] findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.

<u>Lizotte v. Sec'y of Health & Hum. Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981) (quoting <u>Rodriguez</u>

<u>v. Sec'y of Health & Hum. Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)). The Court "must affirm

the [Commissioner's] resolution, even if the record arguably could justify a different conclusion,

so long as it is supported by substantial evidence." <u>Rodriguez Pagan v. Sec'y of Health & Hum.</u>

<u>Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (citing <u>Lizotte</u>, 654 F.2d at 128).

In sum, "the court's function is a narrow one limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements." Geoffroy v. Sec'y of Health & Hum. Servs., 663 F.2d 315, 319 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citing Da Rosa v. Sec'y of Health & Hum. Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam)); see also Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991).

## III.   DISCUSSION

### A.   The ALJ's Determinations Under Listing 3.02A and 3.03A

Deane claims that the ALJ incorrectly found that she does not meet listings 3.02A for COPD or 3.03A for asthma. [ECF No. 15, 5]. Deane claims that her impairments meet listing 3.02A and cites a spirometry report from January 25, 2012, which reflects that she had a pre-bronchodilator FEV1 score of 1.72 and a qualifying post-bronchodilator score of 1.11 [ECF No. 15, 5–6]. Typically, an individual's post-bronchodilator score is higher than her pre-bronchodilator score because a bronchodilator is administered to relieve spasms and improve breathing. Ridgway v. Colvin, No. 2:14-CV-105-TLS, 2016 WL 1567254, at *5 (N.D. Ind. Apr. 19, 2016).  In Deane's case, however, the post-bronchodilator score was lower than the pre-bronchodilator score. Under listing 3.02A, Deane argues that the ALJ should have used her lower post-bronchodilator score of 1.11 to find that she satisfies the criteria of the listing. Id. Instead, the ALJ relied on the claimant's higher pre-bronchodilator FEV1 score of 1.72 to determine that she does not meet 3.02A. [Tr. 12].

The ALJ correctly relied on Deane's higher FEV1 score of 1.72 to conclude that her impairments do not meet listing 3.02A. The regulation specifies that the "highest values of the FEV1 and FVC, whether from the same or different tracings, should be used to assess the severity of the respiratory impairment." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 3.00E. Most courts have relied on the plain meaning of this language to decide that, even where a claimant had one score below the threshold, the higher value is the one that must be considered. See, e.g., McKee ex rel. McKee v. Comm'r of Soc. Sec., No. 2:14-CV-609, 2015 WL 1299562, at *5 (S.D. Ohio Mar. 23, 2015) (discussing cases); Sargent v. Colvin, No. 3:12-CV-01905-AA, 2014 WL 792154, at *3 (D. Or. Feb. 23, 2014) ("[u]nder the plain language of this listing, disability determinations are made by looking at the highest FEV value"); Belton v. Comm'r of Soc. Sec., No. 4:11-CV-00021, 2012 WL 4459033, at *3 (W.D. Va. May 30, 2012).

A minority of courts have decided to consider only the highest post-bronchodilator score, even in the anomalous situation where that value is lower than the pre-bronchodilator score. See Ridgway, 2016 WL 1567254, at *5. In reaching this decision, the Ridgway court cited Eskew v. Astrue, which held that "only the highest post-bronchodilator result is used to assess the severity of the respiratory impairment." 462 Fed. App'x 613, 615 (7th Cir. 2011). The result in Eskew, however, appears to rely on a misreading of 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00E. The Eskew court cites this section, without further explanation, to argue that only post-bronchodilator scores should be assessed. 462 Fed. App'x at 615. The relevant regulation, however, clearly refers to "the highest values of the FEV1," without distinguishing between pre- and post-bronchodilator results. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00E. Furthermore, Eskew concerned a claimant whose pre-bronchodilator result was predictably *lower* than her post-bronchodilator result, meaning that the Eskew claimant, unlike the claimant in Ridgway and

unlike Deane, sought to rely upon *pre*-bronchodilator test results to establish qualification for benefits. See Eskew, 462 Fed. App'x at 615–16.

The Ridgway court acknowledged that its case—wherein the pre-bronchodilator result was unexpectedly the highest score—was distinct from Eskew, but nevertheless held that Eskew applies regardless of whether the pre- or post-bronchodilator score was higher. Ridgway, 2016 WL 1567254, at *5. Because Eskew misreads the relevant regulations, the Court finds this reasoning unpersuasive. Furthermore, the Court is unaware of any First Circuit cases addressing the question of whether post-bronchodilator results should be used when they yield lower scores than pre-bronchodilator results. Therefore, the Court rules that, based on the language of the regulation, the highest FEV value, whether pre- or post-bronchodilator, is controlling. The regulation does not indicate any exception to the rule. Furthermore, because the purpose of the bronchodilator is to improve lung function, a post-bronchodilator score lower than the pre-bronchodilator score could indicate that the "second exhale was something less than an honest effort," which could in turn justify the ALJ's decision to disregard that score. Johnson v. Astrue, No. 2:11-CV-260 JD, 2012 WL 4471607, at *9 (N.D. Ind. Sept. 26, 2012). Consequently, the Court finds the ALJ acted properly in relying on Deane's higher FEV1 score of 1.72 to conclude that her impairments do not satisfy the criteria for listing 3.02A.

Based on the claimant's FEV1 score of 1.72, the ALJ concluded that Deane also does not meet Listing 3.03A. Listing 3.03A, which describes asthma with chronic asthmatic bronchitis, is evaluated based on the criteria for COPD in listing 3.02A. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §3.03A. Since Deane's FEV1 score does not meet listing 3.02A, the ALJ correctly concluded that her impairments also do not exceed or equal listing 3.03A. [Tr. 12]. To meet or equal listing 3.03B for asthma attacks, the claimant must suffer from asthma attacks at least once every two

months or six times a year. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §3.03B. An evaluation period of at least one year is required to determine the frequency of attacks. <u>Id.</u> Hospitalization due to an asthma attack that lasts for longer than 24 hours counts as two attacks. <u>Id.</u> The claimant's medical evidence does not demonstrate that she satisfies any of these requirements. Consequently, the ALJ's determination that the claimant does not exceed or meet listings 3.02A or 3.03B is supported by substantial evidence.

### B.      The ALJ's RFC Determination

#### 1.      Deane's Testimony

Deane claims that the mental portion of the ALJ's RFC evaluation is faulty because the ALJ "cherry-picked" the mental health evidence. In determining a claimant's RFC, the ALJ must consider all of the claimant's testimony about her impairments and limitations in daily life and ability to work. 20 C.F.R. § 404.1529(a). An ALJ's decision to disbelieve a claimant "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence [he or she] considered" in making this decision. <u>Da Rosa</u>, 803 F.2d at 26 (citing <u>Benko v. Schweiker</u>, 551 F. Supp. 698, 704 (D.N.H. 1982). In determining the credibility of a claimant's testimony, an ALJ "need not march through every single step in [his or her] reasoning." <u>Anderson v. Astrue</u>, 682 F. Supp. 2d 89, 97 (D. Mass. 2010) (citing <u>Gordils v. Sec'y of Health & Hum. Servs.</u>, 921 F.2d 327, 330 (1st Cir. 1990)). Further, the ALJ may consider her medical history, her daily activities, and available medical opinions. <u>Velasquez v. Astrue</u>, No. 10-10765-DPW, 2011 WL 3654433, at *7 (D. Mass. Aug. 18, 2011) (citing SSR 96-7p, 1996 WL 374186, at *1–2 (July 2, 1996)). Finally, a "fact-finder's assessment of a party's credibility . . . is given considerable deference and, accordingly, a reviewing court will rarely disturb it." <u>Anderson</u>, 682 F. Supp. 2d at 96 (citing <u>Ortiz</u>, 955 F.2d at 769).

The ALJ found the claimant's testimony not entirely credible. [Tr. 16]. In support of his adverse credibility determination, the ALJ cited the claimant's inconsistent testimony about her ability to provide primary childcare and about her drug addiction, as well as the relatively limited objective evidence of the claimant's alleged back pain, respiratory functioning limitations, and mental functioning limitations. [Tr. 16–17]. Therefore, the ALJ adequately considered the relevant evidence and made specific, supported findings in light of Deane's medical history, daily activities, and available medical opinions.

### 2.    Dr. Powers' Opinions

Deane also objects to the fact that the ALJ did not discuss Dr. Powers' comment that she does not socialize. [ECF No. 15]. In order to assess a claimant's RFC, the ALJ must assess "all of the relevant medical and other evidence," including statements about the claimant's capacities provided by medical sources. 20 C.F.R. § 416.945(a)(3). The ALJ noted that neither of Dr. Powers' examination reports provides a clear medical source statement about Deane's functional limitations and that evidence from Dr. Powers' own examination notes and the claimant's other treating sources shows that Deane is less limited than Dr. Powers' assigned GAF scores of 50. [Tr. 18]. While the ALJ gave "no weight" to Dr. Powers' assigned GAF scores of 50, he put "significant weight" on his examination reports. Id. This indicates that despite not mentioning Dr. Powers' specific note about Deane's socializing, the ALJ did in fact consider Dr. Powers' opinions and comments in making his RFC determination. Furthermore, Dr. Powers' comment that Deane "does not socialize with others" stemmed from Deane's own description of her habits, [Tr. 999], which does not qualify as a medical opinion. Stefanowich v. Colvin, No. 13-30020-KPN, 2014 WL 357293, at *2 (D. Mass. Jan. 30, 2014) (quoting Morris v. Barnhart, 78 F. App'x 820, 824 (3d Cir. 2003)) ("[T]he mere memorialization of a claimant's subjective

statements in a medical report does not elevate those statements to a medical opinion."). Therefore, the ALJ adequately assessed Dr. Powers' relevant statements in determining Deane's RFC.

### 3. George Haywood's Opinions

Deane points out that the ALJ, in assessing her RFC, disregarded certain of counselor Haywood's opinions. The ALJ gave "substantial weight" to the 2013 medical source statement co-signed by Dr. Finkelstein and Mr. Haywood, but "no weight" to Mr. Haywood's 2014 medical source statement, which assigned Deane a GAF score of 48. [Tr. 18–19].

Though Mr. Haywood's employment as Ms. Deane's counselor does not make him an acceptable medical source,[8] the ALJ was nevertheless required to consider his opinion pursuant to SSR 06-06P, 2006 WL 2329939 (Aug. 9, 2006). In evaluating the opinions of individuals who do not qualify as acceptable medical sources, the ALJ can consider, among other factors, the consistency of the opinion with other evidence and how well the source explains his or her opinion. Id. at *4. The ALJ found that Mr. Haywood's 2014 source statement was inconsistent with the opinion Mr. Haywood cosigned with Dr. Finkelstein just one year prior. [Tr. 18]. Furthermore, the ALJ found that Mr. Haywood neglected to explain the significant discrepancy in his opinions, and that his report contained a factual error about the claimant's previous, significantly higher GAF score. Id. Specifically, Mr. Haywood recorded Deane's highest GAF score in the past twelve months as 50, when he and Dr. Finkelstein had assigned her a GAF score

---

[8] Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists (for purposes of establishing visual disorders), licensed podiatrists (for purposes of establishing impairments of the foot or foot and ankle), and qualified speech-language pathologists (for purposes of establishing speech or language impairments). 20 C.F.R. § 404.1513(a). Mr. Haywood, who is a Master of Social Work and worked as Deane's counselor, does not qualify.

of 65 less than a year prior. Id. In light of these determinations, the ALJ permissibly discredited Mr. Haywood's 2014 medical source statement.

### 4.    Dr. Weiner's Opinion

Deane disputes the ALJ's treatment of Dr. Weiner's opinion that the claimant is not a candidate for gainful employment. Though the opinions of a treating physician are generally accorded significant weight, Monroe v. Barnhart, 471 F. Supp. 2d 203, 211 (D. Mass. 2007), "[t]he ALJ is entitled 'to downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where . . . it is internally inconsistent or inconsistent with other evidence in the record,'" Arrington v. Colvin, No. 15-10158-JGD, 2016 WL 6561550, at *16 (D. Mass. Nov. 3, 2016) (quoting Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004)), appeal docketed, No. 17-1047 (1st Cir. Jan. 10, 2017); see also 20 C.F.R. §404.1527(d)(2). Where the ALJ does not give the treating physician's opinion controlling weight, as was the case here, the ALJ may consider "an array of factors" in deciding how to weigh the physician's opinion. Arrington, 2016 WL 6561550, at *16 (quoting Bourinot v. Colvin, 95 F. Supp. 3d 161, 175–76 (D. Mass. 2015). These factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole." Id. The ALJ is not required to explicitly list these factors, but must provide "good reasons" for the weight assigned to a treating physician's medical opinion. Id.; 20 C.F.R. §404.1527(c)(2).

The ALJ here stated that he gave "little to no weight" to Dr. Weiner's opinion that the claimant is not a candidate for full-time employment because "the record indicates Dr. Weiner has not treated the claimant since March 2010" and because "[m]ore recent medical evidence

from the intervening four years indicates that the claimant is less limited than as opined by Dr.

Weiner." [Tr. 17–18]. The disputed opinion stems from a mental health impairment

questionnaire filled out in 2010, about two years before the claimant filed for SSI and SSDI

benefits. [Tr. 458]. It is reasonable, given these clearly articulated explanations, for the ALJ to

have disregarded Dr. Weiner's opinion in light of more recent evidence.

### 5.      Finding by the University of Massachusetts Disability Evaluation Services

The ALJ gave "little weight" to the DES findings that Deane was disabled. [Tr. 17]. The

Social Security Administration is under no obligation to categorize a claimant as "disabled" even

if a medical source opines that a claimant is "disabled" or "unable to work." 20 C.F.R.

§404.1527(d)(1). The ALJ noted that the DES "opinions are not signed by a medical doctor or

any other official, so it is unclear who is endorsing these opinions" and that it was unclear

whether the opinions were based on the claimant's self-reported limitations or on the available

medical evidence. [Tr. 17]. The ALJ discussed a reference to Dr. Weiner at South Coast Medical

Associates in the DES records, but determined that Dr. Weiner did not review or sign any of the

documents. [Tr. 17, 909]. As the DES opinions are not signed, there is no evidence of the

treatment relationship between the claimant and the opinion source. Because the opinions were

unsigned and not binding on the Social Security Administration in any event, the ALJ was

permitted to give little weight to the state DES findings.

### 6.      Social Functioning Limitations

Deane argues that although the ALJ found her to have moderate limitations in social

functioning, he did not adequately incorporate these limitations into her RFC because his

judgments relied on his own lay analysis and not on a "guiding medical opinion." The claimant

further argues that in the First Circuit, an ALJ is precluded from making assessments based on

his own lay views. This broad claim is unsupported. In assessing a claimant's RFC, the ALJ can

make common-sense judgments based on the medical record, so long as they lie within the sphere of a lay person's understanding. Anderson, 682 F. Supp. 2d at 95 (quoting Gordils, 921 F.2d at 329). Furthermore, an ALJ is permitted to "piece together the relevant medical facts from the findings and opinions of multiple physicians." Perry v. Astrue, No. 11-40215-TSH, 2014 WL 4965910, at *6 (D. Mass. Sept. 30, 2014) (quoting Evangelista v. Sec'y of Health & Hum. Servs., 826 F.2d 136, 144 (1st Cir. 1987)). The ALJ may not, however, render medical judgments, id., or "interpret raw medical data in functional terms," Nguyen, 172 F.3d at 35. Contrary to Deane's assertions, the ALJ did not appear to base his RFC limitations "solely on his own lay assessment, rejecting all of the medical opinions." On the contrary, the ALJ's judgment is supported by a number of sources in the record, including medical assessment and evaluation forms. Cf. Anderson, 682 F. Supp. 2d at 95 (quoting Gordils, 921 F.2d at 329). The record shows that the ALJ properly considered the credible evidence and accounted for the claimant's moderate limitations in social functioning by indicating that the claimant could have only occasional contact with the public and could have contact with co-workers as long as she did not perform tasks alongside them. [Tr. 14].

In DiAntonio v. Colvin, the court upheld a hearing officer's findings that the claimant could have "occasional contact with the public and co-workers with no tandem tasks." 95 F. Supp. 3d 60, 70–71 (D. Mass. 2015). In support of this determination, the officer had noted that reviewing physicians found the claimant to have only "mild" limitations in social functioning and that the claimant's functional report indicated that she regularly visited public places and had some ability to interact with authority figures. Id. Based on these considerations, the DiAntonio court held that the hearing officer's findings were supported by the record. Id. at 70.

The record here is analogous to the record in <u>DiAntonio</u>, and supports the ALJ's assigned RFC. On a DES Mental Health Impairment Questionnaire from September 20, 2010, the claimant did not check off "[p]aranoia or inappropriate suspiciousness," "[s]ocial withdrawal or isolation," or [h]ostility and irritability." [Tr. 458]. Consultative examinations in 2012 and 2013 found that the claimant had only "mild" difficulties in maintaining social functioning. [Tr. 111, 123, 137, 150]. The claimant checked "Yes" on a social security functional report when asked whether she can go out alone. [Tr. 380]. The same form prompted the claimant to check the boxes that her "illnesses, injuries, or conditions affect," and the claimant did not check the box for "[g]etting along with others." [Tr. 382]. When asked if she had "ever been fired or laid off from a job because of problems getting along with other people," the claimant checked the "No" box. [Tr. 383]. While the claimant had a "mild" risk of socially inappropriate behavior in January 2013, subsequent DCS Mental Health biopsychosocial assessment forms from July 2013, August 2013, and November 2013 indicate that the claimant posed no risk of socially inappropriate behavior and that the claimant only had "moderate" "[c]onflict with others/ [r]elationship problems." [Tr. 1032, 1040, 1044, 1058]. Similarly, as noted by the ALJ, the claimant's treating physician's assistant found that on February 13, 2013, the claimant had good insight, good judgment, normal mood and affect, and normal recent and remote memory. [Tr. 13, 938]. The ALJ noted that the physician's assistant's findings were "consistent with treatment notes" from Deane's other treating source. [Tr. 13]. Furthermore, an Initial Psychiatric Evaluation by the Family Center Volunteers of America dated February 14, 2014 to March 27, 2014, states that the claimant met her current fiancé "through friends," although "she struggles with making friends," indicating at least some willingness and ability to form friendships. [Tr. 1074–75]. The same form notes that "the [claimant] has several supports in the community." [Tr. 1078]. Finally, the

claimant lived together with her fiancé at the time of the ALJ hearing, which again demonstrates

the ability, even if limited, to connect and function with others. [Tr. 41]. Therefore, the record

supports the ALJ's finding that Deane could have only occasional contact with the public, could

have contact with co-workers, but could not perform tandem tasks with co-workers. [Tr. 14].

## IV.    CONCLUSION

For all of the reasons detailed herein, the Court finds that the ALJ's decision was

supported by substantial evidence and therefore <u>DENIES</u> the claimant's motion to reverse [ECF

No. 15] and <u>ALLOWS</u> the Commissioner's motion to affirm [ECF No. 16].

**SO ORDERED.**

March 29, 2017                                              /s/ Allison D. Burroughs
                                                           ALLISON D. BURROUGHS
                                                           U.S. DISTRICT JUDGE